**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Michael Johnson, *on behalf of himself and all others similarly situated,* | : : : : : |
| Plaintiff, | : |
| v. | : Civil Action No.: 16-cv-04469-SDW-LDW |
| Comodo Group, Inc., | : : |
| Defendant. | : : : : |

## PLAINTIFF'S REPLY MEMORANDUM OF LAW (1) IN OPPOSITION TO CROSS-MOTION TO STRIKE AND (2) IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

PART I - DEFENDANT'S MOTION TO EXCLUDE THE EXPERT REPORT OF ANYA VERKHOVSKAYA SHOULD BE DENIED ...................................................... 2

   I.   LEGAL STANDARD ............................................................................... 2

   II.   PLAINTIFF'S EXPERT ANYA VERKHOVSKAY'S EXPERT REPORT IS ADMISSIBLE .......................................................................................... 3

      a.  Ms. Verkhovskaya is an expert ......................................................... 3
      b.  Ms. Verkhovskaya's expert report sets forth a reliable methodology for (1) identifying the historical user/subscriber of a cellular number and (2) the user/subscriber's current address ........................................................................................ 6

   III.   COMODO HAS FAILED TO SHOW MS. VERKHOVSKAYS'S OPINION AND TESTIMONY SHOULD BE EXCLUDED ............................................... 11

      a.  Ms. Verkhovskaya's methodology is testable ................................. 11
      b.  Ms. Verkhovskaya's reliance on third party vendors is proper ....... 15
      c.  Ms. Verkhovskaya can determine whether a call falls into the class definition ............. 18

PART II - PLAINTIFF'S MOTION FOR CLASS CERTIFICATION SHOULD BE GRANTED ........................................................................................................ 23

   I.   PLAINTIFF'S CLASS IS ASCERTAINABLE ..................................... 23

      a.  The class is based on objective criteria ......................................... 25
      b.  There is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition ................................. 25
      c.  Defendant's opposition to ascertainability is unavailing ................ 27

   II.   PLAINTIFF HAS ESTABLISHED NUMEROSITY ............................. 29

   III.   PLAINTIFF HAS ESTABLISHED COMMON QUESTIONS PREDOMINATE OVER ANY INDIVIDUALIZED INQUIRIES ............................................... 31

   IV.   PLAINTIFF IS TYPICAL OF THE CLASS ........................................ 36

   V.   PLAINTIFF AND HIS COUNSEL ARE ADEQUATE ....................... 38

CONCLUSION ................................................................................................. 40

## TABLE OF AUTHORITIES

**Cases**

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
2017 WL 1806583 (N.D. Cal. May 5, 2017) ...................................................6, 16

*Aranda v. Caribbean Cruise Line, Inc.*,
179 F. Supp. 3d 817 (N.D. Ill. 2016) .......................................................22, 34

*Bakov v. Consol. World Travel, Inc.*,
2019 WL 1294659 (N.D. Ill. Mar. 21, 2019)..............................................6, 26

*Bennett v. GoDaddy.com LLC*,
2019 WL 1552911 (D. Ariz. Apr. 8, 2019).....................................................37

*Birchmeier v. Caribbean Cruise Line, Inc.*,
302 F.R.D. 240 (N.D. Ill. 2014).............................................................1, 26

*Braver v. Northstar Alarm Servs., LLC*,
329 F.R.D. 320 (W.D. Okla. 2018)..............................................................36

*Byrd v. Aaron's Inc.*,
784 F.3d 154 (3d Cir. 2015)......................................................................24

*City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*,
867 F.3d 434 (3d Cir. 2017.................................................................24, 26

*Clough v. Revenue Frontier, LLC*,
2019 WL 2527300 (D.N.H. June 19, 2019)....................................................25

*Daubert v. NRA Grp., LLC*,
189 F. Supp. 3d 442 (M.D. Pa. 2016) ..........................................................21

*Dominguez v. Yahoo!, Inc.*,
2017 WL 390267 (E.D. Pa. Jan. 27, 2017) ...................................................11

*Gager v. Dell Fin. Servs., LLC*,
727 F.3d 265 (3d Cir.2013).......................................................................37

*Hale v. Creditors Relief LLC*,
2018 WL 2539080 (D.N.J. June 4, 2018) ...............................................35, 38

*In re Flonase Antitrust Litig.*,
284 F.R.D. 207 (E.D. Pa. 2012) .................................................................32

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994)................................................................2

*James v. Glob. Tel\*Link Corp.*,
  2018 WL 3727371 (D.N.J. Aug. 6, 2018).................................................24

*Johansen v. GVN Michigan, Inc.*,
  2015 WL 3823036 (N.D. Ill. June 18, 2015) ..........................................37

*Kannankeril v. Terminix Int'l, Inc.*,
  128 F.3d 802 (3d Cir. 1997)...........................................................2, 3

*Kolinek v. Walgreen Co.*,
  311 F.R.D. 483 (N.D. Ill. 2015) ......................................................31

*Krakauer v. Dish Network L.L.C.*,
  311 F.R.D. 384 (M.D.N.C. 2015) ................................................5, 16, 27

*Krakauer v. Dish Network, L.L.C.*,
  2015 WL 5227693 (M.D.N.C. Sept. 8, 2015)............................4, 10, 12, 15, 16

*Legg v. PTZ Ins. Agency, Ltd.*,
  321 F.R.D. 572 (N.D. Ill. 2017)......................................................35

*Leyse v. Bank of Am. Nat. Ass'n*,
  804 F.3d 316 (3d Cir. 2015)..........................................................28

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012).......................................................29, 31

*McCurley v. Royal Seas Cruises, Inc.*,
  2019 WL 1383804 (S.D. Cal. Mar. 27, 2019) .......................................4, 16

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802, 815 (7th Cir. 2012)....................................................32

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353, 371 (3d Cir. 2015).....................................................32

*O'Shea v. Am. Solar Sol., Inc.*,
  318 F.R.D. 633 (S.D. Cal. 2017)....................................................1, 37

*Perez v. Rash Curtis & Assocs.*,
  2019 WL 1491694 (N.D. Cal. Apr. 4, 2019) ............................................6

*Pineda v. Ford Motor Co.*,
    520 F.3d 237 (3d Cir. 2008)...........................................................................................2

*Reyes v. BCA Fin. Servs., Inc.*,
    2018 WL 3145807 (S.D. Fla. June 26, 2018) ...............................4, 5, 10, 12, 16, 26

*Shamblin v. Obama for Am.*,
    2015 WL 1909765 (M.D. Fla. Apr. 27, 2015) ...............................4, 10, 12, 27

*Southwell v. Mortg. Inv'rs Corp. of Ohio*,
    2014 WL 3956699 (W.D. Wash. Aug. 12, 2014) ................................13, 15

*Stewart v. Abraham*,
    275 F.3d 220 (3d Cir. 2001).........................................................................29

*Susinno v. Work Out World Inc.*,
    862 F.3d 346 (3d Cir. 2017)....................................................................35, 38

*Thomas v. Cumberland Cty.*,
    2012 WL 3780452 (D.N.J. Aug. 31, 2012)...................................................18

*Thomas v. Dun & Bradstreet Credibility Corp.*,
    100 F. Supp. 3d 937 (C.D. Cal. 2015) ........................................................37

*Toney v. Quality Res., Inc.*,
    323 F.R.D. 567 (N.D. Ill. 2018).......................................1, 23, 25, 31, 37

*United States v. Mitchell*,
    365 F.3d 215 (3d Cir. 2004).........................................................................12

*West v. California Servs. Bureau, Inc.*,
    323 F.R.D. 295 (N.D. Cal. 2017)..................................................................32

*Wilson v. Badcock Home Furniture*,
    329 F.R.D. 454 (M.D. Fla. 2018)..................................................................17

*Youngman v. A&B Ins. & Fin., Inc.*,
    2018 WL 1832992 (M.D. Fla. Mar. 22, 2018).................................................4

## Other Authorities

*In the Matter of Advanced Methods to Target and Eliminate Unlawful Robocalls*, FCC CG Docket
    No. 17-59, Second Report and Order (Dec. 13, 2018)...............................28

**Rules**

Fed. R. Evid. 703 ..................................................................................................................4

## **INTRODUCTION**

Plaintiff, Michael Johnson, by and through his undersigned counsel, respectfully submits this Reply Memorandum of Law (1) In Opposition to Cross-Motion to Strike and (2) In Support of Motion for Class Certification.

Over the course of years, Defendant utilized powerful automatic dialers and deceptive prerecorded messages all to call cellular telephones and aggressively sell its "security" In opposition to certification, Defendant does not even attempt to argue it had the required prior express consent to make these calls.   Nor can it; these were all cold-calls of the worst and most annoying kind as the consumer complaints demonstrate. (Taylor Decl. Ex. E & F).   Absent certification here, class members' rights will go un-vindicated and Defendant will avoid the consequences for its brazen and unlawful telemarketing, consequences mandated by Congress in the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, specifically to stop this behavior.

To avoid just those consequences, Defendant attacks nearly every aspect of the motion. With this shotgun approach to opposing certification, hoping at least one of the bullet fragments will hit the mark, Defendant has failed to show that certification of a class of all persons it called to sell its product without consent, with autodialers and with prerecorded voices is inappropriate here.   This is not a close case and the type of mass, unlawful telemarketing is ideally situated for class treatment. *O'Shea v. Am. Solar Sol., Inc.*, 318 F.R.D. 633, 640 (S.D. Cal. 2017); *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 593-94 (N.D. Ill. 2018).   So too is Defendant's use of its annoying prerecorded call. *See, Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 256 (N.D. Ill. 2014); *Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320, 330 (W.D. Okla. 2018).

For the reasons already explained in Plaintiff's moving papers, and for those reasons explained below, the Court should grant Plaintiff's motion for class certification.

## PART I

## DEFENDANT'S MOTION TO EXCLUDE THE EXPERT REPORT OF ANYA VERKHOVSKAYA SHOULD BE DENIED

### I.   LEGAL STANDARD

"The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997).   Federal Rule of Evidence 702, which governs the admissibility of expert testimony, "has a liberal policy of admissibility." *Id.*

Rule 702 has three major requirements: "(1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Id.*; *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).   Regarding the second requirement, the Third Circuit has "concluded that 'an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.'" *Kannankeril*, 128 F.3d at 806 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994)).   To be reliable, expert testimony must be "based on the 'methods and procedures of science,' rather than on 'subjective belief or unsupported speculation.'" *Id.* (quoting *Paoli*, 35 F.3d at 742).

The following are nonexclusive factors that a district court should consider when determining whether a methodology is reliable:

> "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put."

*Paoli*, 35 F.3d at 742 n.8.

2

"*Daubert* does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology." *Kannankeril*, 128 F.3d at 806. "Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined." *Id.* Thus, the court's focus is on "principles and methodology and not on the conclusions they generate"; "[t] he analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination." *Id.,* 128 F.3d at 807.

## II.   PLAINTIFF'S EXPERT ANYA VERKHOVSKAY'S EXPERT REPORT IS ADMISSIBLE

### a.  Ms. Verkhovskaya is an expert

Ms. Verkhovskaya is the President of Class Experts Group, LLC ("CEG"), a company which offers litigation support services with a focus on data management and data analysis, particularly in the area of class action litigation, class administration and consumer class action litigation support services. Verkhovskaya Report at ¶ 5. She has over 19 years of experience serving as an expert witness or court-approved administrator in class action lawsuits, including those under the TCPA. Verkhovskaya Report at ¶ 6. She has extensive experience identifying and locating class members in order to administer complex class actions and other administration matters. Verkhovskaya Report at ¶ 7. She has been personally involved with the administration, processing and adjudication of millions of class action-related claims, including analysis, classification, processing documentation (paper and digital) and related correspondence." Verkhovskaya Report at ¶ 8. Moreover, she has "regularly served as an expert witness, providing opinions and testimony concerning ascertainability, class certification, notice adequacy and settlement issues." Verkhovskaya Report at ¶ 9.

As one court observed, Ms. Verkhovskaya is "amply qualified, and [her] relevant

3

experience, education, and training render [her] competent to offer expert testimony in TCPA cases." *Shamblin v. Obama for Am.*, 2015 WL 1909765, at *3 (M.D. Fla. Apr. 27, 2015); *see also, e.g., Reyes v. BCA Fin. Servs., Inc.*, 2018 WL 3145807, at *13 (S.D. Fla. June 26, 2018), *reconsideration denied,* 2018 WL 5004864 (S.D. Fla. Oct. 15, 2018) ("Several other district courts have . . . relied on Verkhovskaya's expertise when deciding whether to certify TCPA and other classes.") (collecting cases); *Youngman v. A&B Ins. & Fin., Inc.*, 2018 WL 1832992, at *4 (M.D. Fla. Mar. 22, 2018) (Verkhovskaya has "extensive experience in identifying class members in TCPA class actions.").

Comodo nonetheless argues that Ms. Verkhovskaya is "not qualified to opine on the reliability of LexisNexis's reverse-append methodology. Mot. to Exclude at p. 33. Comodo bases this assertion on the fact that (1) her college degree is not related to LexisNexis's methodology; (2) she has not worked at LexisNexis or spoken with anyone at LexisNexis regarding the accuracy of its data; and (3) she has not identified peer reviewed studies or other relevant literature and during her February 2019 deposition she was not aware of an FCC Report from December 2018. Mot. to Exclude at pp. 34-35. However, "[a]n expert may rely on data that she did not personally collect and need not have conducted her own tests." *Krakauer v. Dish Network, L.L.C.*, 2015 WL 5227693, at *9 (M.D.N.C. Sept. 8, 2015) (internal citations and quotation marks omitted). Instead, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of . . . [i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion." Fed. R. Evid. 703. Here, LexisNexis is commonly used in TCPA litigation as a reliable means to identify the historical users/subscribers of telephone numbers and their addresses. *See McCurley v. Royal Seas Cruises, Inc.*, 2019 WL 1383804, at *9-10 (S.D. Cal. Mar. 27, 2019) ("summarily reject[ing]" argument that use of LexisNexis in TCPA class action

was not reliable); *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 391 (M.D.N.C. 2015), *aff'd*, 925 F.3d 643 (4th Cir. 2019) (approving use of "Lexis data to obtain the names and addresses of most persons associated with these numbers during the class period").

Moreover, Comodo has not submitted evidence establishing that LexisNexis is not a reliable source of information such that the Court should question Ms. Verkhovskaya's ability to testify about the reliability of LexisNexis. At most, Comodo points to a disclaimer from LexisNexis warning that its data should be independently verified, Mot. to Exclude at p. 21, but other courts have found LexisNexis to be reliable notwithstanding this disclaimer. *See Reyes*, 2018 WL 3145807, at *12–13 (rejecting attempt to strike Verkhovskaya's expert opinion under *Daubert* where defendant's expert claimed LexisNexis had questionable accuracy and noted that "LexisNexis (and similar vendors) displays a disclaimer in its database, informing users that its results should be 'independently verified.'"). In fact, Comodo's own expert testified that ███

████████████████████████████████████████████████████████

████████. Deal Tr. 45:1-46:25 ("████████████████████████

████████████████████████████████").[1]

Further, Comodo's complaints about the reliability of LexisNexis, and Ms.

---

[1] Exhibits are attached to the Second Declaration of Stephen Taylor:
- Exhibit M excerpts of the transcript of the October 3, 2017 deposition of Michael Whittam.
- Exhibit N excerpts of the transcript of the June 28, 2019 deposition of Bruce Deal.
- Exhibit O excerpts of the transcript of the February 7, 2019 deposition of Anya Verkhovskaya.
- Exhibit P excerpts of the transcript of the September 20, 2018 deposition of Mirza Atik Ahmed Mehran.
- Exhibit Q are excerpts of the transcript of the July 31, 2018 deposition of Israel Israilov.
- Exhibit R is a true and correct copy of the March 29, 2018 letter sent by Jeffrey S. Jacobson – then counsel to Comodo – to the Honorable Leda Dun Wettre.
- Exhibit S excerpts of Defendant's Objections and Responses to Plaintiff's Interrogatories.
- Exhibit T an email exchange produced by Defendant regarding initiating and setting up the prerecorded message program.

Verkhovskaya's ability to testify about the same as an expert, goes to the *weight* of her expert opinion, not its admissibility. *See, e.g., Bakov v. Consol. World Travel, Inc.*, 2019 WL 1294659, at *12 (N.D. Ill. Mar. 21, 2019) ("CWT also argues that Peters-Stasiweicz's opinions are unreliable because she has not substantiated her assertions that the data sources, such as LexisNexis data, are reliable and accurate. As Plaintiffs correctly point out, this argument goes to the weight and not admissibility of Peters-Stasiweicz's testimony.")[2]; *Perez v. Rash Curtis & Assocs.*, 2019 WL 1491694, at *5 (N.D. Cal. Apr. 4, 2019) ("defendant's argument that the third-party sources Verkhovskaya used provided inaccurate data" goes to the weight, not the admissibility, of her opinion); *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, 2017 WL 1806583, at *4 (N.D. Cal. May 5, 2017) ("defendants' objection to Ms. Verkhovskaya's use of Lexis Nexis data to remove business numbers from her output list relates to the weight of her opinion, not exclusion").

At bottom, the fact that Ms. Verkhovskaya did not study LexisNexis in college, or did not work for LexisNexis, do not change the fact that Ms. Verkhovskaya qualifies as an expert in this case.

> ### b. Ms. Verkhovskaya's expert report sets forth a reliable methodology for (1) identifying the historical user/subscriber of a cellular number and (2) the user/subscriber's current address

Ms. Verkhovskaya has crafted a reliable methodology for identifying the historical user/subscriber of a cellular telephone number and their current address.

To do so, Ms. Verkhovskaya utilized a spreadsheet provided by Plaintiff's counsel. Verkhovskaya Report at ¶¶ 16-25. The spreadsheet was originally produced by Comodo to Plaintiff; Comodo represented that it contained all calls made by Comodo to a cellular telephone number during the class period in order to sell an SSL Certificate. Verkhovskaya Tr. 46:14-19;

---

[2] Ms. Peters-Stasiweicz referenced in *Bakov* is an associate of Ms. Verkhovskaya's and employed by her firm Class Experts Group, LLC.

50:12-15.   Specifically, the spreadsheet was produced in response to Plaintiff's Interrogatory No. 9, which asked Comodo to "[l]ist (by date, time, name and telephone number called) all calls placed by you or on your behalf to a *cellular line* during the Class Period in order to sell an SSL Certificate." Interrog No. 9, Taylor 2nd Decl. <u>Ex S</u>.   In its response, Comodo did not object to the interrogatory to the extent it asked Comodo to only identify *cellular telephone* numbers.   Nor has it amended its interrogatory response.   Moreover, Comodo's counsel represented to Plaintiff's counsel that it had scrubbed the spreadsheet to limit it to cellular telephone numbers before producing it to Plaintiff. *See* Deal Tr. 28:8-31:1 (███████████████████████████████████████████████████████).[3]

The   spreadsheet   contained   ███████████████████████████████████.
Verkhovskaya Report at ¶ 17.   ██████████████████████████████████████████
█████████████████████████████████████████████████████████████████
██. Verkhovskaya Report at ¶ 18.   Ms. Verkhovskaya first isolated those instances where a telephone number was (1) called using a prerecorded voice and (2) was called using the ViciDial system in automatic mode. Verkhovskaya Report at ¶ 19.

To identify calls where a prerecorded voice was used, █████████████████████████
█████████████████████████████████. Verkhovskaya Report at ¶ 20; Verkhovskaya Tr. 60:15-20 (Ms. Verkhovskaya was asked to count up the number of times a status code said "AL" or "AUTOVM"); Mehran Tr. 152:9-154:20 (████████████████████

---

[3] While Comodo's counsel claimed during Mr. Deal's deposition that ████████████████████
█████████████████████" Deal Tr. 28:24-29:1, this document in fact was produced in litigation in response to formal discovery requests, not as part of a settlement discussion.  Moreover, the parties have now gone to three separate private and court-ordered mediations and attempted to settle this case based on this list of cellular numbers identified and produced by Comodo. Nonetheless, it now claims for the first time, six months *after* Plaintiff filed for certification and disclosed his expert, that the spreadsheet is not actually what it claimed to be.



); Florell Tr. 109:7-110:10 ("AL" as the status code "means that the phone call came to the agent session, and that the agent would have pressed the button to send the call to an answering machine or to a prerecorded message.   It would have first been changed to AM, and then after the message had been completed playing it, it would have been changed to AL, assuming default settings"); Mehran Tr. 133:4-8 (▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ); 147:19-25; 153:23-25 (▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ); Whittam Tr. 22:23-23:7.

To identify calls where a call was placed by the ViciDial in automatic mode, Ms. Verkhovskaya identified those calls where t▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Verkhovskaya Tr. 62:9-14 (Ms. Verkhovskaya was asked to count up the number of times a status code said auto and manual); Whittam Tr. 63:7-10 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ); Mehran Tr. 143:7-144:16.

In total, Ms. Verkhovskaya identified ▮▮▮ unique telephone numbers which were called ▮▮▮ times where the call has an ▮▮ or ▮▮▮ disposition code in ▮▮▮ of the spreadsheet or are identified by code▮▮▮▮▮▮▮. Verkhovskaya Report at ¶ 22.

Ms. Verkhovskaya will use the list of class telephone numbers to identify the names and addresses of the historical users and subscribers of those numbers and identify the current addresses of those persons. Verkhovskaya Report at ¶ 26.   Specifically, Ms. Verkhovskaya will coordinate with LexisNexis; input a file of telephone numbers to the LexisNexis online batch interface; the file is then processed via an established, custom and proprietary algorithm. Verkhovskaya Report at ¶ 31.   "The resulting output file provides a comprehensive report of

subscriber/users of the telephone numbers, including name, address, and associated date ranges, and whether the number is a cellular number or not. This process is commonly known as reverse-append." Verkhovskaya Report at ¶ 31. This "reverse-append process is able to identify the subscriber/user/owner of a given telephone number at a point in time." Verkhovskaya Report at ¶ 32.

Ms. Verkhovskaya has used the reverse-append process in other cases, including cases where the Court certified putative classes. Verkhovskaya Report at ¶ 33. Through her independent review of test and live case files over the years, Ms. Verkhovskaya has verified the accuracy of the information she received and has found it to be reliable." Verkhovskaya Report at ¶ 34.

However, "[i]f all historical names and addresses are not fully identified through the initial reverse-append process, [Ms. Verkhovskaya] will implement additional data processes via TransUnion and/or Microbilt." Verkhovskaya Report at ¶ 35. For instance, if LexisNexis does not identify a street number for a given address, Ms. Verkhovskaya will use TransUnion to see if they have the missing part of the address. Verkhovskaya Tr. 105:12-106:11.

After identifying the names and addresses of individuals associated with the telephone numbers of the calls at issue, Ms. Verkhovskaya "can update the addresses through the use of the United States Postal Service (USPS) National Change of Address (NCOALink®) database, which contains approximately 160 million records or 48 months of permanent addresses. The database is updated daily and USPS regularly provides change-of-address information to its licensees. This process helps reduce undeliverable-as-addressed (UAA) mail by correcting input addresses prior to mailing. If requested, [Ms. Verkhovskaya] could also update the addresses through the use of the USPS' expanded National Change of Address, NCOAAnkLink®, database, which contains 96

9

months of permanent addresses." Verkhovskaya Report at ¶ 36.

If further information is needed to locate updated addresses, Ms. Verkhovskaya "will coordinate with a Data Processor that offers skip-tracing services such as Microbilt or Experian to obtain updated addresses for those persons not in the NCOALink® or NCOA AnkLink® databases." Verkhovskaya Report at ¶ 37.

The vendors Ms. Verkhovskaya will use – LexisNexis and TransUnion – are reputable data vendors who Ms. Verkhovskaya has frequently partnered with. Verkhovskaya Report at ¶ 28. Their databases are based on "approximately 100,000 or so different sources that they use for information gathering that they started over 100 years ago. And those sources include utility bills, credit bureaus, credit cards, self-reporting surveys, DMVs, loan applications, White Pages, Yellow Pages, et cetera." Verkhovskaya Tr. 95:9-15.

Ms. Verkhovskaya's methodology has been repeatedly approved by courts in TCPA class actions. *See, e.g., Reyes*, 2018 WL 3145807, at *13 (declining to strike Ms. Verkhovskaya's expert onion based on purported issues with her near-identical methodology); *Shamblin*, 2015 WL 1909765, at *3; *Krakauer*, 2015 WL 5227693, at *10.[4]

---

[4] Comodo attempts to distinguish *Krakauer* on the grounds that in that case "the 'vast majority' of the names and addresses associated with called numbers were obtained from the defendant's own call logs." Mot. to Exclude at p. 22.   However, that does not change the fact that the methodology which was used for incomplete name and address information was substantially similar to the methodology proposed in this case. *See Krakauer*, 2015 WL 5227693, at *4.   Comodo additionally notes that in that case the defendant did not dispute the reliability of third-party vendors while Comodo in this case does.   But as discussed, Comodo's complaints about the reliability of the third party vendors Ms. Verkhovskaya intends on relying on is unfounded, and therefore this distinction is meaningless.   Further, Comodo notes that in that case Ms. Verkhovskaya reduced the class data by more than 85% by removing unconnected calls. Yet as discussed *infra* here Comodo's expert identifies less than 1% of calls which *may* not have been connected and thus removing these numbers would not have had anywhere close to the effect that it did in *Krakauer*.

### III.   COMODO HAS FAILED TO SHOW MS. VERKHOVSKAYS'S OPINION AND TESTIMONY SHOULD BE EXCLUDED

In its motion to exclude, Comodo throws the kitchen sink at Ms. Verkhovskaya in an attempt to exclude her opinion and testimony.   Plaintiff will address each of Comodo's argument in turn, none of which have any merit.

#### a.   Ms. Verkhovskaya's methodology is testable

Comodo first argues that Ms. Verkhovskaya's methodology is inadmissible because it is purportedly not "testable." Mot. to Exclude at pp. 18-19.   It says that "Ms. Verkhovskaya has merely proposed a methodology for identifying proposed class members, but has not actually performed any analysis." *Id.*   In support, it cites *Dominguez v. Yahoo!, Inc.*, a case where "Yahoo had abandoned the program that enabled the E-mail SMS Service" and therefore "it was not possible for anyone to test the Yahoo system." *Dominguez v. Yahoo!, Inc.*, 2017 WL 390267, at *19 (E.D. Pa. Jan. 27, 2017) ("it would not be possible to 'resuscitate' the E-mail SMS Service that existed when Plaintiff had purchased his phone such that anyone could test the Yahoo system at this time.").   The Court, while "not necessarily being critical of Plaintiff or his counsel or experts," found that "the fact that the Yahoo system is no longer operable, and could not be resuscitated, basically prevented any expert, no matter how qualified, to 'test' the Yahoo system to meet the definition of latent capacity." *Id.* at *20.   Because in that case it was not physically possible for Plaintiff's experts' methodologies to be tested ever, the Court understandably held the expert opinions were not testable or admissible.

But there is no comparison to be drawn between *Dominguez* and this case.   Unlike the unique, proprietary system at issue in *Dominguez* which was no longer in existence when the experts in that case set forth their opinions, in this case Ms. Verkhovskaya's methodology (1) has already been tested in other cases and (2) involves the use of services (LexisNexis, TransUnion,

Microbilt) which are currently in existence.   Therefore, her methodology is testable.

Here, Comodo could have but chose not to test Ms. Verkhovskay'a methodology.   Its expert did not test using Ms. Verkhovskaya's primary source LexisNexis or Transunion.   Instead ██████████████████████████████.   Deal Tr. 144:18-20; Cert. Opp. pg. 19-20. ████████████████████████████████.   Deal Tr. 148:17-149:6 (████████████████████). ████████████████ *Id.* at 40:23-25 (██████████████████ ████████████████████).   In no way does Plaintiff propose using one skip tracing source source like MicroBilt to identify and ascertain class members.

Comodo attempts to equate "testability" with whether a methodology has already been tested in this case, but that is not correct.   Testability, which "has also been described as 'falsifiability,'" is assessed by determining whether a proposition is "*capable* of being proved false." *United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (emphasis supplied).   Because here Ms. Verkhovskaya's methodology is capable of being proved false, it is testable regardless of whether the methodology has in fact been tested yet or not. (And in fact, the methodology has been used and approved by other courts myriad times. *See .e.g., Reyes*, 2018 WL 3145807, at *13; *Shamblin*, 2015 WL 1909765, at *3; *Krakauer*, 2015 WL 5227693, at *10.)

Comodo additionally relies on *Southwell v. Mortg. Inv'rs Corp. of Ohio*, but that case is easily distinguishable. *See Krakauer*, 2015 WL 5227693, at *6 (distinguishing *Southwell*).   As an initial matter, *Southwell* did not involve a *Daubert* motion or an attempt to exclude an expert witness's testimony or opinion.   There, the plaintiff's expert regarding numerosity, Jeffrey Munson, "had no expertise in the TCPA or 'do-not-call policies or laws or practices.'" *Southwell v.*

*Mortg. Inv'rs Corp. of Ohio*, 2014 WL 3956699, at *3 (W.D. Wash. Aug. 12, 2014).   The Court found it "difficult to know where to begin in describing the lack of rigor demonstrated the evidence which Plaintiffs have produced." *Id.* The expert "had no idea what the numbers represent," and "Plaintiffs present[ed] no proof (nor even any argument) that the numbers accurately represent what they purport them to represent." *Id.*   The Court also found that there were "several factors which could affect the accuracy of the totals which (as even Dr. Munson admitted) are unaccounted for." *Id.*[5] There were additional deficiencies with Mr. Munson's calculations and the Court ultimately could not find "on a preponderance of the evidence basis, that Plaintiffs have established the numerosity element of their proof based on Dr. Munson's report." *Id.* at *4.

By contrast, here Ms. Verkhovskaya identified ███████ unique telephone numbers in a spreadsheet that Comodo represented contained its calls to cellular telephones to sell SSL Certificates, Verkhovskaya Report at ¶ 22, and even taking each of Comodo's expert's opinions at face value and discounting the class list accordingly, numerosity is easily established here.

Further, unlike in *Southwell*, here, there is ample proof that these numbers represent what Plaintiff argues they do. That is because the key codes used by Ms. Verkhovskaya showing whether a call was automated or not (██████ vs. ████████) and when a prerecorded message was used (█████ and █████████) were *systemic* codes entered into the log when triggered:

- ████████████████████████████████████████████████
  ██████████████████████████. Whittam Tr. 63:7-10 ("
  ███████████████); Mehran Tr. 143:7-144:16.

---

[5] The factors were "(1) whether any individuals on the National Do Not Call Register ("NDNCR") later consented to be called (i.e., "opted in"); (2) whether any of the individuals on the NDNCR were persons with whom Defendant had an existing business relationship; (3) how many phone numbers on the list were business numbers (which are not properly included on the NDNCR); and (4) how many of the calls were made within the 30–day grace period permitted for compliance with the do-not-call requests." *Southwell*, 2014 WL 3956699, at *3.   None are applicable in this case.



- ████████████████████████████████████████. Mehran Tr. 133:4-8 ████████████████████████████████████████; 147:19-25; 153:23-25 ████████████████████████████; Whittam Tr. 22:23-23:7.

- ████████████████████████████████████████ Mehran Tr. 152:9-154:20 ████; Florell Tr. 109:7-110:10 ("AL" as the status code "means that the phone call came to the agent session, and that the agent would have pressed the button to send the call to an answering machine or to a prerecorded message.   It would have first been changed to AM, and then after the message had been completed playing it, it would have been changed to AL, assuming default settings")

To the extent Defendant argues that these codes were entered manually, subject to ███████████████████████████████████████████████████████ (II Decl. ¶ 16; Opp Cert pg. 8) that is simply false; ███████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████.[6] It is on this proof that class size and membership can be determined and on which Ms. Verkhovskaya's tasks were determined.

And while, Ms. Verkhovskaya was also an expert *Southwell*, her testimony was addressed in a single paragraph:

Plaintiffs introduced her testimony purportedly to establish that it was possible to determine (1) whether phone numbers of the NDCNR List are business numbers (Reply, pp. 7–8), (2) whether particular phone numbers belong to Washington residents (*Id.* at p. 9), and (3) the number of calls made to particular individuals after those individuals registered on the NDCNR or made do-not-call requests. (*Id.* at pp. 11–12.) Ms. Verkhovskaya's declaration is entirely prospective; i.e., it

---

[6] Mr. Israilov also falsely testified under oath that ████████████████████████ ████████████. Israilov Tr. 157:1-159:22. ████████████. Taylor 2nd Decl. Ex. T, March 01-07, 2013 email chain (Mr. Israilov on March 7: "████████████████████████████████████████████████ ████████").

> simply describes what she intended to do with the data provided by Plaintiffs. Such analysis as this expert did perform was not performed until after the submission of the declaration. (Esposito Surreply Decl., Dkt. No. 182, Ex. B, ("Verkhovskaya Depo"), pp. 50–51.) On this basis, her declaration cannot constitute proof of the numerosity element required to establish that Plaintiffs are entitled to prosecute a class action lawsuit.

*Southwell*, 2014 WL 3956699, at *4.   While the court noted that her declaration was prospective in that it describes what she intended to do with the data provided by Plaintiffs, in this case Ms. Verkhovskaya has already reviewed and used the spreadsheet produced by Comodo to identify the number of class members for purposes of numerosity.   Moreover, the *Southwell* case was from five years ago and since then Ms. Verkhovskaya's methodologies have been tested and approved by courts numerous times.   Further, it appears that the Plaintiffs in *Southwell* needed both Mr. Munson's *and* Ms. Verkhovskaya's reports together.   Given the serious deficiencies with Mr. Munson's report, it appears that the Court found Ms. Verkhovskaya's report, on its own, did not establish numerosity because it only dealt with certain discrete issues.   For purposes of this case, *Southwell* does not stand for the proposition that a methodology, which has already been proven to be reliable in other cases, is not admissible because it has not been entirely completed in the present case.

Ultimately, because Ms. Verkhovskaya's methodology can be tested, and because Comodo's expert has already tested it, Comodo's arguments that the methodology is inadmissible as not "testable" is wrong.

### b.  Ms. Verkhovskaya's reliance on third party vendors is proper

Next, Comodo complains that Ms. Verkhovskaya's methodology is inadmissible because it relies on third party vendors. (Mot. to Exclude at pp. 19-24).   Yet as discussed above in Section II (a), "[a]n expert may rely on data that she did not personally collect and need not have conducted her own tests." *Krakauer*, 2015 WL 5227693, at *9 (internal citations and quotation marks

omitted).   The vendors Ms. Verkhovskaya relies on are used in TCPA litigation as a reliable means to identify the historical users/subscribers of telephone numbers and their addresses. *See McCurley*, 2019 WL 1383804, at *9-10; *Krakauer*, 311 F.R.D. at 391.   And courts have rejected arguments like Comodo's here based on the purported inaccuracy of third-party vendors. *See Reyes*, 2018 WL 3145807, at *12 (rejecting defendant's expert critique that Ms. Verkhovskaya "delegate[ed] the call-records analysis to third-party vendors").

Comodo notes that Ms. Verkhovskaya testified that "she has previously received data from LexisNexis that conflicted with the data she obtained from other third-party vendors." Mot. to Exclude at p. 21.   During the cited portion of her deposition transcript, she was asked "Have you ever received results that were conflicting where you may get one result from Lexis identifying a user and a different result from one of the other data sources you identify?," to which she responded "It happens once in a while." Verkhovskaya Tr. 96:3-8.   However, courts have found that some errors during data processing is typical. *See Krakauer*, 2015 WL 5227693, at *9-10 ("Dish also expresses concern with the possible 14% error rate, as it creates the potential for millions of dollars in liability for non-actionable calls. (Doc. 58 at 1718.) The Court has considered the potential error rate and does not find it unreasonably high for these particular circumstances. *See Daubert,* 509 U.S. at 594. Like its other arguments, this goes more to the weight of the evidence, not its admissibility." & "To the extent Ms. Verkhovskaya missed a few business numbers out of more than 28,000, (*see* Doc. 48–2 at 10–15), that is insufficient to establish that she has not reliably applied her methodology to the data"); *Abante Rooter & Plumbing, Inc.*, 2017 WL 1806583, at *4 ("the Court agrees that her calculations overreach and must be adjusted by removing individuals that inquired about Alarm.com's products or services prior to receiving a call. However, this only requires modification, by removing telephone numbers from her output

list that appear in Alarm.com's CLS records, and will not affect her output figure of nearly 400,000 enough to undermine numerosity. Modification, not exclusion, is appropriate").

Comodo relies on *Wilson v. Badcock Home Furniture*, but that case is distinguishable. There, the Plaintiff sought to certify a class of people "where Defendant's call records report a wrong number associated with said cellular telephone number," but the Court denied certification because "common issues of fact and law do not predominate." *Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 456 & 459 (M.D. Fla. 2018). Specifically, the Court found that the "most complex, fact-specific—aspect of each case" is "how that number entered Defendant's records and, related, the issue of consent." *Id.* In that case the "Defendant could still demonstrate consent a variety of ways" because "it is quite likely that a defaulting customer may reply with 'wrong number' when the customer answers a call from the creditor collecting a past-due debt. Or someone in the customer's household might intentionally mislead the caller on behalf of the defaulting customer." *Id.* Thus a "wrong number" notation in that case may not be a "proxy for no consent." *Id.* at 460. But unlike that case, here Comodo did not have consent to call any of the class members whatsoever, and thus there are no issues regarding consent. While the Court in *Wilson* observed potential issues identifying which person told the defendant "wrong number," the Court found that this was "itself not fatal, it does highlight a weakness in the proposal: Short of relying on a claimant's assertions, there is no way definitively to determine who actually answered the call from Defendant and stated 'wrong number.'" *Id.*, 329 F.R.D. at 457–58. However, the Court cited "a general reluctance by many courts to deny class certification because of administrative difficulties, even in ensuring that all members of a class are accounted for" and found that it "need not base its ruling upon, nor definitively resolve, the issue of ascertainment." *Id.,* 329 F.R.D. at 459.

Comodo's citation to *Thomas v. Cumberland Cty.*, is equally unpersuasive. There, the expert "ha[d] not shown that his testimony amounts to anything more than his own subjective belief and unsupported speculation of what occurred on that day, or, alternatively, mere repetition of the testimony offered by other witnesses which do not require an expert's explanation to render comprehensible to a jury." *Thomas v. Cumberland Cty.*, 2012 WL 3780452, at *5 (D.N.J. Aug. 31, 2012). He made "no reference to industry standards, codes, publications, training, or anything other than his own years of knowledge and experience." *Id.* By contrast, here Ms. Verkhovskaya relies on data vendors which are commonly approved of and used in TCPA class cases like this one.

### c.  Ms. Verkhovskaya can determine whether a call falls into the class definition

Next, Comodo complains that Ms. Verkhovskaya cannot determine whether a call falls into the class definition for a number of different reasons.  To the extent Defendant or its expert criticizes Ms. Verkhovskaya or Plaintiff for not incorporating certain codes into her analysis concerning "███████" or "███████", "███████" or "status," such criticism is misplaced: Defendant did not produce the codes Mr. Deal relied upon in discovery at all and only produced them *after* it filed its opposition to certification and motion to strike and only after requested by Plaintiff. Deal Tr. 32:9-33:25 (references documents listed in Deal Report Par. 7(ii).

First, Comodo notes that Ms. Verkhovskaya relied on Plaintiff's counsel's representation that the spreadsheet produced by Comodo only contained cellular telephone numbers. Mot. to Exclude at p. 25.  It claims that Plaintiff's counsel's representation that the spreadsheet only contains cell phone numbers is an "unsupported assumption." *Id.* Not so.  As discussed, the spreadsheet was produced in response to Plaintiff's Interrogatory No. 9, which asked Comodo to "[l]ist (by date, time, name and telephone number called) all calls placed by you or on your behalf

to a *cellular line* during the Class Period in order to sell an SSL Certificate." Interrog No. 9, Taylor 2nd Decl. Ex S. Far from an assumption, Plaintiff's representation that the spreadsheet contains only cell phones was based on *Comodo's* verified interrogatory responses.  Comodo did not object to the interrogatory to the extent it asked Comodo to only identify *cellular telephone* numbers and had not amended its interrogatory response.  In addition, as discussed above

██████████████████████████████████████████████████████████████████████

████████████████████████████████████. *See* Deal Tr. 28:8-31:1.

Further, Comodo's contention that "many of the phone numbers Ms. Verkhovskaya identifies as cellular phone numbers in fact appear to be landlines," Mot. to Exclude at p. 25, is, *at best*, an unfounded assumption.  Comodo cites to Mr. Deal's expert report to support its claim that some cell phone numbers "appear to be landlines" but none of his assertions actually establish that to be the case:

- Mr. Deal points to the fact that ████████████████████████████████████
████████████████████████████████████████" Deal Report at ¶ 20.
However, when asked ████████████████████████████████████████████████
████████████████████████████████████████████████████████████ Deal
Tr. 63:18-64:9.  In fact, the only evidence is that ████████████████████
████████████████████████████████████████ Whittam Tr. 34:14-35:10. There does not appear to be any corollary between ████████ and non-cellular numbers at all.

- Mr. Deal points to the fact that ████████████████████████████████████
████████████████████████████████████████████. Deal
Report at ¶ 21.  Yet during his deposition, at most here says these are ████████
████████████████████████████████████████████████████████████████████
████████████████████ Deal Tr. 63:14-64:2.  Indeed, he says ████████████
████████████████████ Deal Tr. 65:21-22.

- Mr. Deal points to the fact that ████ calls have the ████████████████
████████████████████████████████████████████████

█████████████████████████ Deal Report at ¶ 22.  Here too, he ███
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████ Deal Tr.
77:18-78:4. That a person would have a cellular telephone with an away message as
"Office Closed" is entirely normal and does not signify the line is, in fact,
non-cellular.

- Mr. Deal points to ████████████████████████████████████████████
  ████████████. Deal Report at ¶¶ 29-30.  But Mr. Deal ███████████
  ██████████████████████████ Deal Tr. 84:3-8, ████████████████████
  ████████████████████. Deal Tr. 85:12-19.

Comodo also complains that Ms. Verkhovskaya "assumed based on Plaintiff's counsel's
instructions that certain disposition codes indicate that 'prerecorded voices were used.'" Mot. to
Exclude at p. 26.  But Ms. Verkhovskaya's reliance on the disposition code associated with a
prerecorded voice was correct: to identify calls where a prerecorded voice was in fact used, she
identified those calls where the related disposition code said ██████ or █████████████
Verkhovskaya Report at ¶ 20; Verkhovskaya Tr. 60:15-20.   Comodo's employees and a
representative of ViciDial had testified to what these codes actually signified. Mehran Tr.
152:9-154:20 (█████████████████████████████████████); Florell
Tr. 109:7-110:10 ("AL" as the status code "means that the phone call came to the agent session,
and that the agent would have pressed the button to send the call to an answering machine or to a
prerecorded message.   It would have first been changed to AM, and then after the message had
been completed playing it, it would have been changed to AL, assuming default settings"); Mehran
Tr. 133:4-8 ("████████████████████████████████████████████████████
████████████████████████████████████████████████████); 147:19-25;
153:23-25 (███████████████████████████████); Whittam Tr. 22:23-23:7.

While Comodo notes Ms. Verkhovskaya testified that "AL" means that "a recipient of such phone call picks up the phone, he or she hears a prerecorded voice," Mot. to Exclude at p. 26, when in fact it means that a prerecorded voice was played during an answering machine message, *id.*, is immaterial.  The foundation for her calculations and for what these codes mean comes from the sworn deposition testimony of Comodo employees and ViciDial. Ms. Verkhovskaya properly identified the number of calls containing ▇ and ▇▇▇▇.

Comodo makes a similar complaint regarding calls coded to be associated with the ViciDial in automated mode. Mot. to Exclude at p. 26; Cert. Opp. pg. 16.  Defendant makes much of Ms. Verkhovskaya's purported failure to consider what it meant for the term "▇▇▇▇" to appear under "status" when "AUTO" appears under "comments." Cert. Opp. pg. 16. However, Defendant's Fed. R. Civ. P. 30b6 designee, Mr. Whittam, testified that to ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇ Whittam Tr. 63:7-10. This in turn was based on the ▇▇▇▇▇▇ Defendant did actually produce in discovery which showed exact same thing:

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Whittam Tr. Ex. 3A (Taylor 2nd Decl. Ex. M). Mr. Mehran testified to the same. Mehran Tr. 143:7-144:16.

Now, Defendant presents an affidavit from Mr. Israilov which contradicts the prior sworn testimony. Israilov Decl. ¶ 27.  This is a classic sham affidavit and, were this a motion for summary judgment, Mr. Israilov's declaration should be excluded. *Daubert v. NRA Grp., LLC*, 189 F. Supp. 3d 442, 458 (M.D. Pa. 2016), *aff'd*, 861 F.3d 382 (3d Cir. 2017) ("Where the

nonmovant in a motion for summary judgment submits an affidavit that directly contradicts an earlier Rule 30(b)(6) deposition and the movant relied upon and based its motion on the prior deposition, several courts have disregarded the later affidavit."). Whether Mr. Israilov has any credibility will ultimately be up to the finder of fact to determine. Here, however, Ms. Verkhovskaya's task was based on the record evidence.

Further, Comodo also cites to the Deal Report to claim the codes were ██████████ ██████████ but Mr. Deal testified that he ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. Deal Tr. 131:7-137:1. Accordingly, his speculation about ████████████████, and Comodo's reliance on the same, should be disregarded.

Comodo cites to the portion of Mr. Deal's report that contends that "████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████" Deal Report at ¶ 48. However, during the very *first* second of the prerecorded message, Taylor 1st Decl. Ex. A, one can quite clearly hear Ms. Ortiz's recorded "Hello." That recorded "Hello", in and of itself, is sufficient to violate the TCPA. *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 825 (N.D. Ill. 2016) ("*Ybarra* [relied upon by Comodo] does not indicate that a caller escapes liability if the recipient receives a prerecorded call and hangs up the phone once she realizes this, without hearing much (or any) of the message. Plaintiffs have established that they received calls as part of this call campaign, and that every call included a prerecorded message. This is sufficient to

trigger TCPA liability, and *Ybarra* does not counsel otherwise.")



Likewise, Comodo points to the portion of Mr. Deal's report noting that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮, Mot. to Exclude at p. 27, but here too this figure is statistically insignificant, and Plaintiff has no issue with modifying the class definition to exclude employees of the Defendant.[7]

The same goes for calls which purportedly "▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮" Mot. to Exclude at pp. 26-27.  According to Comodo's expert, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮. Deal Tr. 101:5-13.  And for the total ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. Thus, here too Comodo complains about a figure that is a small, small micro fraction of the class.  More critically, this becomes a *damages* question whether a class member can recover for a particular call which can easily be determined by reference to the call data – Mr. Deal did so himself.

## PART II

### PLAINTIFF'S MOTION FOR CLASS CERTIFICATION SHOULD BE GRANTED

### I.   PLAINTIFF'S CLASS IS ASCERTAINABLE

In opposition, Defendant badly misconstrues Third Circuit authority on ascertainability, skipping steps in the analysis and attempting to impose some heighted standard which does not exist. (Cert Opp. pg. 22-23).

---

[7] Excluding from a class groups of persons with particular interests, such as employees, judges, counsel etc., is a commonly done by Courts. *See, e.g., Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 593 (N.D. Ill. 2018) ("The following persons are excluded from the Class: Quality, any parent, subsidiary, or affiliate of Quality, Mercuris and the officers, directors, agents, servants or employees of Quality as of August 16, 2016, Class Counsel, and any judge presiding over the action.").

As set forth by the Third Circuit most recently in 2017, a Rule 23(b)(3) class is currently and readily ascertainable based on objective criteria where the plaintiff shows that "'(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 439 (3d Cir. 2017) (*quoting Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) and vacating and remanding denial of certification in TCPA matter). Critically, and missing from the opposition, "plaintiff need not 'be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members *can* be identified.' " *Id.* (*quoting Byrd*, 784 F.3d at 163) (emphasis in *Byrd*); *see also Nepomuceno v. Midland Credit Mgmt., Inc.*, 2016 WL 3392299, at *2 (D.N.J. June 13, 2016) (Wigenton, J.) ("With regard to the second prong of the ascertainability requirement, 'a plaintiff need only show that class members *can* be identified.'" (*quoting Byrd*, 784 F.3d at 163) (emphasis in *Byrd*).

Further, the use of affidavits or other confirmation from class members is entirely appropriate mechanism to ascertain class members. *City Select*, 867 F.3d at 441 ("[a]ffidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard."). This Court has approved the use of "affidavits from putative class members" to establish elements of class member claims when used in conjunction with common evidence "i.e. Defendant's business records." *Nepomuceno*, 2016 WL 3392299 at *2. Indeed, the use of affidavits or other confirmation by class member is entirely appropriate under Third Circuit law to ascertain a class to establish that Class members owned a particular number at a particular point in time. *James v. Glob. Tel*Link Corp.*, 2018 WL 3727371, at *10 (D.N.J. Aug. 6, 2018) ("[c]lass members need only provide an affidavit with proof that the particular phone number

24

associated with the account belonged to that class member during the relevant time period."). Where such attestations by class members are tied to the Defendant's records – here the class data showing the numbers called – the class is ascertainable.

### a. The Class Is Based On Objective Criteria

Membership in the class[8] is based on the objective criteria of (1) whether they are persons in the United States, (2) whether they were called on their cellular telephones by Comodo, (3) whether the call was telemarketing, (4) whether Comodo called using the ViciDial ATDS in Auto mode or with a prerecorded voice, and (5) when the call occurred. "There is nothing vague or subjective about this definition" which is based on "objective criteria." *Toney*, 323 F.R.D. at 581 (class of "[a]ll persons who are or were the subscribers of the telephone numbers on the Class List, and to whom, from January 3, 2009, through August 16, 2016, Quality Resources, Inc., made a call or calls through its Vicidial calling system to their cellular telephones promoting Sempris goods, and where the cell phone number was obtained as a result of their transaction at the website www.stompeez.com" was based on objective criteria); s*ee also Clough v. Revenue Frontier, LLC*, 2019 WL 2527300, at *3 (D.N.H. June 19, 2019) ("Here, objective criteria determine the parameters of the class: all wireless users or subscribers who were sent a text message by Supreme Data as part of the NTE campaign."). Defendant does not dispute this first prong is met.

### b. There is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition

To the second prong, there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition because Plaintiff

---

[8] The proposed class is: (1) All persons in the United States (2) to whose cellular telephone number Comodo made a telemarketing call (3) using the ViciDial ATDS in Auto mode or a prerecorded voice (4) within four years of the filing of the complaint.

shows that class members can be identified.

As set forth in Part I, II, b. *supra*, Plaintiff's expert proposes a methodology for identifying the historical user/subscriber of a cellular telephone number and their current address. More succinctly stated in her report:

> In order to identify, within a historical timeframe, the names and addresses of subscribers/users of telephone numbers, I will first coordinate with Data Processor LexisNexis to effectuate a process which I have run in numerous class actions. This process involves inputting file of telephone numbers to the LexisNexis online batch interface; the file is then processed via an established, custom and proprietary algorithm. The resulting output file provides a comprehensive report of subscriber/users of the telephone numbers, including name, address, and associated date ranges, and whether the number is a cellular number or not. This process is commonly known as reverse-append.

Verkhovskaya Report at ¶ 5.

Defendant claims it is improper for class members to establish class membership through a sworn statement or affidavit (Cert. Opp. pg. 30) as noted this is wrong as it is entirely appropriate to ascertain a class through class member affidavits provided such attestations are used in conjunction with common evidence. *City Select*, 867 F.3d at 441.

The reverse-append process Plaintiff proposes here by Ms. Verkhovskaya and CEG has been approved as a reliable and appropriate means to ascertain class members in TCPA class actions. *Bakov*, 2019 WL 1294659 at *18 (the methodology used to identify class members described in Peters-Stasiweicz's report is reliable and has been accepted by courts in this District and across the country); *see also Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 247 (N.D. Ill. 2014) (approving using "the records of third-party phone carriers and third-party database providers"); *see also Reyes*, 2018 WL 3145807, at *13 (approving same methodology, finding that it "employed generally reliable methodologies which entail, *inter alia*, performance of detailed statistical analysis and utilization of LexisNexis data that has been independently

verified"); *Shamblin*, 2015 WL 1909765 (same); *Krakauer*, 311 F.R.D. at 391 (same).

### c. Defendant's opposition to ascertainability is unavailing[9]

First, Defendant asserts that to meet the ascertainability standard Plaintiff must "establish, by a preponderance of the evidence that the ██████ unique telephone numbers were assigned to a cellular service at the time of the call, rather than to a landline or a VoIP number." (Cert. Opp. pg. 30). This is wrong, to establish the second prong of ascertainability Plaintiff needs to provide a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. Plaintiff's expert provides a reliable mechanism to identify class members based on the class data and reliable data sources. Further, the evidence that the class data itself consists of cellular telephone numbers is based on Defendant's own responses to discovery requests.

Second, Plaintiff is "not merely propos[ing] a method of ascertaining the class without any evidentiary support that the method will be successful." (Cert. Opp. pg. 25 (*quoting Carrera*, 727 F.3d at 306-07) (where class was not ascertainable where Plaintiff had "no evidence" that there were any pertinent records even existed that could identify members). Plaintiff provides ample evidentiary support: the class data Comodo produced, witness testimony as to what key codes in the log signify, Plaintiff's expert report and deposition setting forth her methodology to run a reverse-append process to identify class members. Defendant certainly has due process rights to defend itself from a judgment, but those are not triggered at the class certification stage and it will have its due opportunity to challenge the ascertained class at trial or through the claims process.

---

[9] Defendant's arguments on ascertainability regarding the use of Lexis-Nexis (Cert. Opp. pg 31), Ms. Verkhovskaya's analysis of the call log (*Id*. pg. 33) were addressed in Plaintiff's opposition to the motion to strike, *supra*, and are wrong and do not defeat certification for the reasons stated therein.

Third, that people may use reassigned or ported numbers is no bar to ascertainability. Defendant makes much of a 2018 FCC report on reassigned numbers. (Cert. Opp. pg. 27-28, citing *In the Matter of Advanced Methods to Target and Eliminate Unlawful Robocalls*, FCC CG Docket No. 17-59, Second Report and Order (Dec. 13, 2018)). Defendant misapplies the report which itself states that there are "commercial databases . . . to aid callers" though the "databases are not comprehensive, and thus callers and consumers alike continue to be frustrated by unwanted calls to reassigned numbers."   It is unclear from the report whether the FCC used "comprehensive" here to mean an all in one go-to data source or that the various databases themselves were lacking.   As the FCC in the report meant set out to create one unified database, the FCC's use of the term "comprehensive" here was noting the lack of one singular go-to source which frustrated callers. Plaintiff's expert testified that the data processors have information on reassigned numbers which she will use for identification and notice purposes. (Verkhovskaya Tr. 97:5-23). Further, this issue of reassigned numbers is not new in TCPA litigation but its impact on a case varies greatly.   For instance, in a wrong number case where the class is essentially those to whom a number was reassigned, it can pose challenges though not insurmountable.   Here, where the class is not debtors, or wrong numbers, but specifically targeted people, there is no reason to believe reassigned numbers will make up any sizeable part of the class.

Fourth, Defendant's assertion that users and subscribers of a given number are not both appropriate class members (Cert. Opp. pg. 29) is simply wrong under Third Circuit law. A user of a phone or a subscriber of a phone has standing to bring a claim under the TCPA. *Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 327 (3d Cir. 2015) (subscriber *or* the regular user of a phone number had standing to assert TCPA claim); n.14 ("Bank of America suggests that standing must be limited to one person because the Act authorizes only one $500 award per violation. *See* 47

U.S.C. § 227(b)(3)(B). Putting aside the fact that § 227(b)(3) makes available other forms of relief, we see no reason why the statutory sum could not be divided among the injured parties.").

## II.   **PLAINTIFF HAS ESTABLISHED NUMEROSITY**

"There is no minimum number of members needed for a suit to proceed as a class action," the Third Circuit has held that generally this requirement can be satisfied with a class of as little as 41 members. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012) ("We have observed . . . that 'generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.'") (quoting *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001)).

Numerosity in this case is based on the ▮▮▮▮ number of telephones in the call data with calls showing they were made in automatic mode or using a prerecorded voice. Verkhovskaya Report ¶¶ 22-25.   As noted above, that call data was produced by Defendant to Plaintiff in discovery as representing calls made to *cellular* telephone numbers. Interrog No. 9, Taylor 2nd Decl. Ex S ("[l]ist (by date, time, name and telephone number called) all calls placed by you or on your behalf to a cellular line during the Class Period in order to sell an SSL Certificate.").   In response, Comodo produced the call data spreadsheet which Plaintiff and Ms. Verkhovskaya relied upon. *Id.* ("Comodo further responds that it will produce a spreadsheet containing information identified after a reasonable search, responsive to non-objectionable portions of this Interrogatory.")   It did not object in any way to identifying the cellular numbers in its response or claim it could not do so or did not do so.   Indeed, Plaintiff met and conferred with Comodo's counsel ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See, e.g.,* Deal Tr. 29:16-20. On March 29, 2018, counsel for the Defendant filed a letter with the Court specifically advising that "Comodo also will provide call log data respecting the putative class."

(Doc. No. 56; Taylor Sec. Decl. Ex. R).   Both parties have used that data – produced by the Defendant as cellular numbers – for four separate mediations.   At *no time* did Comodo amend its discovery responses or advise that the class data did not consist of cellular numbers.

It was not until Comodo filed its opposition to certification on May 28, 2019, and disclosed its expert the same day (after the conclusion of discovery and four and a half months after Plaintiff moved for class certification) that Comodo suggested that the class data produced in discovery did reflect calls to cellular telephones. During the conversation on this matter during Mr. Deal's June 28, 2019, deposition, counsel for Comodo admitted that ███████████ ██████████████████. Deal Tr. 30:12:-31:1. Relying on this sandbagging, Defendant hopes to defeat certification now.

However, here, there is direct evidence that the threshold of approximately 40 persons required for numerosity is easily met.   First, there is the fact that the class data Plaintiff and Ms. Verkhovskaya relied upon was produced as a list of cellular numbers by Defendant in response to Plaintiff's Interrogatory No 9. That list contains ████ unique numbers which meet the class criteria.   Even now, Comodo *does not deny* that the class data it produced contained cellular numbers.   While its counsel ███████████, Deal Tr. 30:12:-31:1, there is no denial that they in fact scrubbed a master list of calls to produce cellular numbers.[10] Nor does Comodo come forth in opposition and explain that this list is something other than it represented it to be. It would be incredibly simple for Comodo to say "this list was never scrubbed to identify cellular numbers and produce the same in response to discovery demand" but it does not so; instead it is attempting to create ambiguity in the record.   The class data was produced in discovery, for this litigation, in response to a demand for identification of cellular numbers after Defendant culled

---

[10] In Plaintiff's counsel experience this is standard practice where a defendant does not want to produce non-cellular data, which would not be relevant, to Plaintiff or their counsel.

the data to remove non-response, i.e., non-cellular numbers. That evidence establishes numerosity.

Second, Comodo itself made no effort whatsoever to . (Israilov Tr. 88:14-90:25; 90:11-25 (" ")). That is, for the time period at issue here July, 2012, and August 4, 2016, Comodo was . Thus, it is simply inconceivable and devoid of common sense that Comodo did not call more than 40 persons on their cellular line which meet the class definition and the joinder of which would be impracticable. *A & L Indus., Inc. v. P. Cipollini, Inc.*, 2013 WL 5503303, at *2 (D.N.J. Oct. 2, 2013) ("a court can rely on 'common sense' and 'forgo precise calculations and exact numbers' where a plaintiff comes forward with 'sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition ....'" (*citing Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012)).

### III.  PLAINTIFF HAS ESTABLISHED COMMON QUESTIONS PREDOMINATE OVER ANY INDIVIDUALIZED INQUIRIES

The common questions which are at the heart of each class members claims are capable of common class-wide proof and predominate over individual questions.

The common questions are whether Comodo's telephone system is an ATDS, whether Comodo used prerecorded messages, whether Comodo's practice of crawling the internet to obtain class members' contact information constituted prior express consent, and whether treble damages are warranted. *See A & L Indus., Inc.*, 2013 WL 5503303, at *3; *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 492-93 (N.D. Ill. 2015); *Toney*, 323 F.R.D. at 586.

"'Individual questions need not be absent . . . . [Rule 23(b)(3)] requires only that those questions not predominate over the common questions affecting the class as a whole." *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 219 (E.D. Pa. 2012) (quoting *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 815 (7th Cir. 2012)); *see Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 371 (3d Cir. 2015). Comodo does not identify individual issues which would predominate over the common issues here. Opp Cert. pg. 36.

First, whether the number dialed was assigned to a cellular service when called and identifying the called party, the user or the subscriber, do not create individualized issues which predominate where Plaintiff has proposed a reverse lookup process to identify cellular numbers and their users and subscribers. *West v. California Servs. Bureau, Inc.*, 323 F.R.D. 295, 302 (N.D. Cal. 2017), *leave to appeal denied sub nom. Membreno v. California Serv. Bureau, Inc.*, No. 17-80258, 2018 WL 1604629 (9th Cir. Mar. 27, 2018) ("defendant does not persuade as this inquiry can be resolved on a classwide basis through a reverse lookup service. According to plaintiffs' expert, the reverse lookup service will identify the *users* for each of the phone numbers which appear in defendant's call log databases, not merely the account holder. [ ] Stated differently, a reverse lookup will generate a list of all individuals who customarily use each phone number. (*Id.*) This list would necessarily include family members who use the cell phone number and arguably have authority to consent to be called at that number.").   As set forth above and as approved in other cases, this reverse look up process is based on common proof, the class data, and permits resolution of class identification through common means.   Where individual issues do arise for more than one person associated with a cellular device, class members may be required to submit affidavits or certifications to confirm the called number is theirs.

Second, whether a call in the class data was successfully placed does not present individualized questions which predominate. Comodo's expert testified that ███████████ ██████████████████████████████████████████. Del Tr. 101:5-13.   And for the total ███████calls to the class, Mr. Deal identified ███████████████████████. Even if he is correct that those calls would not be actionable, they are easily identified (they have in fact been identified) and administratively dealt with.

Third, whether a call in the dataset was outbound or inbound does not predominate.   Mr. Deal identified ███████████████████████████████████████ ██████████████████████. Deal Tr. 127:22-128:18. There is nothing in the record to show ████████ in the data set means an incoming call. Mr. Deal himself did not know. *Id.* Assuming that Defendant can prove that they are indeed inbound calls from persons, these██ ████████████████████████████████████. *Id.* ("██████████████████ ██████████████████████████████████████████ ██████████████"").

Fourth, whether a call was made for a purpose other than sales does not defeat predominance.   First, Defendant's Rule 30(b)(6) witness testified unequivocally that Comodo uses its dial system "████████████████████" Whittam Tr. 58:14-17. Second, Defendant relies on Mr. Deal's testimony that ████████████████████████████ ████████████████████████. Deal Report. ¶ 41; Deal Tr. 124:4-126:13. He identifies ████████████████████████████ ████████████████. If Defendant can prove these calls were not sales calls in spite of what its corporate representative testified, this small number can also easily be identified

and removed from class liability. *Id.* Tr. 124:24-125:12) ("███████████████████████████████ ███████████████████████████████████ ").

Fifth, whether a prerecorded message actually played on a recipient's voicemail does not defeat predominance. This question may also easily be resolved by reference to the objective class data. In his report, Mr. Deal points to ████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████ " (Deal Report at ¶ 48).   However, during the very *first* second of the prerecorded message (Taylor <u>Ex. A</u>), one can quite clearly hear Ms. Ortiz's recorded "Hello."   That recorded "Hello," in and of itself, is sufficient to violate the TCPA. *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 825 (N.D. Ill. 2016) ("*Ybarra* [relied upon by Comodo] does not indicate that a caller escapes liability if the recipient receives a prerecorded call and hangs up the phone once she realizes this, without hearing much (or any) of the message. Plaintiffs have established that they received calls as part of this call campaign, and that every call included a prerecorded message. This is sufficient to trigger TCPA liability, and *Ybarra* does not counsel otherwise.").   Even if this Court were ultimately to decide that the "Hello" on a prerecorded telemarketing message sent with a sales purpose was itself not actionable, as with Defendant's other examples, such calls could be excluded easily. Therefore, identifying them and dealing with them do not present challenges to predominance. Just the opposite, these examples show that the common proofs here can resolve these individualized circumstances regarding the small number of calls.

Fifth, whether absent class members were injured by a call may also be resolved by common proof.   A call made in violation of the Act is, on its own, an injury sufficient to state a claim and recover under the TCPA for Plaintiff and any class member. *Susinno v. Work Out*

*World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (allegation of one (1) unanswered and unsolicited prerecorded message left on a cellular telephone voicemail is, with no more claim of harm, sufficient to state an injury under the TCPA) (rejecting claim Plaintiff lacked a cognizable injury and standing); *Hale v. Creditors Relief LLC*, 2018 WL 2539080, at *3 (D.N.J. June 4, 2018) ("unsolicited automated or prerecorded telephone calls were the precise injury addressed by the TCPA.").    Thus, Plaintiff and class members to whom Comodo made unsolicited automated or prerecorded telephone calls to their cellular telephones, all suffered the same injury.

Defendant's citation to *Legg v. PTZ Ins. Agency, Ltd.*, 321 F.R.D. 572, 577 (N.D. Ill. 2017) in this regard is entirely misplaced.   There "injury" affected predominance where defendant argued, and presented ample proof, that individual class members had consented to the calls. Here, there is no proof of consent whatsoever, written, express or otherwise, for Defendant's telemarketing calls.   In fact, according to Defendant's own expert, the data he had shows *only* 1.1% of all 148,738 calls to class members resulted in a sale of Comodo's SSL certificates. (Deal Tr. 153-156).    That is one sale per one hundred calls. This does not indicate that Comodo was making calls class members welcomed or that they wanted to purchase Defendant's product. Instead, it indicates Comodo's sales program was exactly what it appears to be: a high volume telemarketing operation that *required* mass and repetitive calls to sell products the targeted group overwhelmingly was not interested in buying.[11] This practice is precisely what the TCPA is meant to prevent.

*The* key questions for all class members are whether ViciDial is an ATDS, whether Comodo used prerecorded messages, whether Comodo's practice of crawling the internet to

---

[11] Further, even the 1.1% may have been induced to purchase product under false pretenses as Defendant advised non-Comodo customers that it was calling to "renew" their certificate. Taylor Decl. Ex. A; Ortiz Tr. 129:20-21 ("That was not used for current Comodo customers. No.").

obtain class members' contact information constituted prior express consent, and whether treble damages are warranted.   Resolution of these questions can be based on common proof. Resolution of these questions will drive the outcome of all class members claims and predominate over any individual issues that may arise.   Thus, predominance is satisfied and resolution through class action is the superior means of adjudication.

## IV.   **PLAINTIFF IS TYPICAL OF THE CLASS**

Typicality tests whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Nepomuceno*, 2016 WL 3392299, at *4.   Plaintiff's claims are typical of the class.   As with all class members, Defendant obtained Plaintiff's number by ███████████████████████████.   As with all class members, Defendant called Plaintiff on his cellular phone with its ViciDial dialer in ████████.   As with all class members, Defendant used a prerecorded message in its calls to Plaintiff's cellular phone.   And, as with all class members, the calls were telemarketing and Defendant did not seek or obtain any consent whatsoever for the calls.   Thus, typicality is satisfied. *Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320, 330 (W.D. Okla. 2018) ("Braver's claim and the class members' claims arise from the same operative allegation: that without express written consent, a call was initiated, using a prerecorded voice, to Braver's and the class members' residential telephone lines, in an effort to market Northstar's home security systems, in violation of the TCPA. Braver's claim is typical of the class member's claims. The typicality requirement is satisfied."); *McMillion v. Rash Curtis & Assocs.*, 2017 WL 3895764, at *7 (N.D. Cal. Sept. 6, 2017)   ("Plaintiffs have demonstrated that Perez's claims are typical of the claims of the classes, which he seeks to represent, namely that defendants called Perez after obtaining his phone number through skip tracing, allegedly without his consent. That is the general theory of liability for all of the proposed classes."); *Toney*, 323

F.R.D. 567 at 585 ("Toney's claims are typical of the class members' claims given that her claim has the same essential characteristics as the class at large."); *O'Shea v. Am. Solar Sol., Inc.*, 318 F.R.D. 633, 637 (S.D. Cal. 2017) (typicality satisfied where "like the unnamed members, [plaintiff] experienced the nuisance of receiving Defendant's telemarketing, autodialed cold calls on his cell phone").

Like in *Braver*, *supra*, Defendant raises "specious" arguments in opposition which do not bear on whether Plaintiff is typical of the class.   It asserts that Plaintiff is atypical because "█████ ██████████████████████████████████" (Cert Opp at 38) and Plaintiff was not a "business."   However, whether Comodo was calling the cellular lines of a business or a "consumer" is irrelevant as "use of a cellular telephone line for business purposes has no impact on the applicability of the TCPA." *Bennett v. GoDaddy.com LLC*, 2019 WL 1552911, at *10 (D. Ariz. Apr. 8, 2019) (certifying class).   That is, the TCPA, 47 U.S.C. § 227(b)(1)(A)(3), protects and provides a claim for *all* parties called on their cellular telephone without consent whether they be a "business", "consumer" or any other type of person. *Thomas v. Dun & Bradstreet Credibility Corp.*, 100 F. Supp. 3d 937, 944 (C.D. Cal. 2015) ("As other federal counts have noted, [the TCPA] 'prohibits calls using an automated dialing system to any telephone number assigned ... to a cellular telephone service' and accordingly does not distinguish' between calls to residential versus business lines.") (*quoting Johansen v. GVN Michigan, Inc.*, 2015 WL 3823036, at *1 (N.D. Ill. June 18, 2015)).   As the Third Circuit has said, "[t]he only exemptions in the TCPA that apply to cellular phones are for emergency calls and calls made with prior express consent . . . there is no established business relationship . . .   that applies to autodialed calls made to cellular phones." *Gager v. Dell Fin. Servs., LLC,* 727 F.3d 265, 273 (3d Cir.2013).   None of those exceptions apply here. The consumer/business distinction is irrelevant to Plaintiff's claims,

37

Defendant's defenses, and does not affect typicality.

Second, regardless of what Comodo says it ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███. (Israilov Tr. 88:14-90:25; 90:11-25 ("██████████████████████████████

████████████████████████████████████")).

Third, a call made in violation of the Act, even a single unanswered prerecorded message that goes to voicemail, is, on its own, an injury sufficient to state a claim and recover under the TCPA. *Susinno* 862 F.3d 346 at 351 (3d Cir. 2017) (allegation of one (1) unanswered and unsolicited prerecorded message left on a cellular telephone voicemail is, with no more claim of harm, sufficient to state an injury under the TCPA) (rejecting claim Plaintiff lacked a cognizable injury and standing); *Hale v. Creditors Relief LLC*, 2018 WL 2539080, at *3 (D.N.J. June 4, 2018) ("unsolicited automated or prerecorded telephone calls were the precise injury addressed by the TCPA."). Thus, as to Plaintiff and class members, that Comodo made unsolicited automated or prerecorded telephone calls to their cellular telephones is the typical and common injury. That Plaintiff or anyone else may or may not have used their website for "commercial" purposes is irrelevant to the claims and defenses and typicality is satisfied.

## V.   **PLAINTIFF AND HIS COUNSEL ARE ADEQUATE**

Defendant's only basis for asserting Plaintiff and his Counsel are inadequate is its bizarre interpretation of the Tolling Agreement Plaintiff entered into with Comodo Ca, Inc. and Sectigo Limited f/k/a Comodo CA Limited (together "Comodo CA"). Plaintiff entered into the Tolling Agreement to protect his interests in pursuing his own claims and claims on behalf of other putative class members against Comodo CA.

38

Comodo CA Limited was the "certificate authority" which issued the actual SSL certificates marketed by Comodo. It, with Comodo, initiated, oversaw and implemented the telemarketing program at issue here owned and run by the same person Melih Abdulhayoglu. In October 2017, during the pendency of this litigation, Melih Abdulhayoglu[12] and Comodo Group sold Comodo CA Limited to private equity firm Francisco Partners.[13]

To preserve claims against Comodo CA should Comodo Group or its liable entities fail to pay any judgment in this case, Plaintiff entered into the tolling agreement which provides that:

> Comodo CA agrees to suspend and toll the running of any statute of limitations related to Johnson's claims, in either an individual or class capacity, against Defendant Comodo CA, Inc., and/or Sectigo Limited f/k/a "Comodo CA Limited" based on the passage or lapse of time with respect to Johnson's claims against Comodo CA as set forth in either the Second or Third Amended Complaints for a period from the date of this Agreement until six (6) months following the entry of a judgment against CGI or the dismissal of such claims, which judgment or dismissal becomes final, through the expiration of time for any appeals, or if an appeal is taken, from the final resolution of any such appeals, whichever is earlier (the "Tolling Period").

(Doc. No. 118-1 ¶ 2).

As entry of the Comodo CA entities into this litigation would have caused months or years of additional delay in the form of discovery or additional motion practice, dismissal of Plaintiff's claims against the CA without prejudice with the tolling of limitations was the best course to protect the Class.   If Plaintiff is successful against Comodo Group but Comodo Group does not satisfy any judgment, Plaintiff may pursue the Comodo CA entities (it is understood that there is an agreement which requires Defendant here to indemnify Comodo CA and the venture capitalists

---

[12] Melih Abdulhayoglu is the CEO and principal officer of all Comodo entities. https://www.forbes.com/profile/melih-abdulhayoglu/#1b34f0b33edf

[13] https://www.apnews.com/a2e6a6ef63d283c46837fb0067bead59 ("Comodo CA was acquired by private equity firm Francisco Partners from Comodo Group in October 2017").

at Francisco Partners for any of Comodo CA's exposure). In no way does the Tolling Agreement release any entities from liability nor does it purport to do so.

Defendant's reading of the Tolling Agreement as applying to only Johnson's claims is inaccurate and is the opposite of what the agreement states.   Similarly, Defendant's claim that the Tolling Agreement puts Plaintiff and his counsels' "self-interest ahead of the absent class" is unsupported.   The agreement preserves claims while Plaintiff and the class can purse the same claims against this Defendant without hindrance.    As stated in Plaintiff's opening brief, he and his counsel are adequate to represent the class.

<u>**CONCLUSION**</u>

Plaintiff respectfully requests the Court grant Plaintiff's Motion for Class Certification under Rule 23 (b)(3) against Defendant, appoint Plaintiff as Class Representative, appoint Plaintiff's attorneys as Class Counsel, and Deny Defendant's Motion to Strike the Expert Report of Anya Verkhovskaya.

Dated: July 12, 2019

Respectfully submitted,
PLAINTIFF, Michael Johnson
By:   */s/ Stephen Taylor*
Stephen Taylor
By:   */s/ Sergei Lemberg*
Sergei Lemberg
*/s/ Sofia Balile*
Sofia Balile
LEMBERG LAW, LLC
43 Danbury Road
Wilton, CT 06897
Telephone: (203) 653-2250
Facsimile:   (203) 653-3424
*Attorneys for Plaintiff*

## CERTTIFICATE OF SERVICE

I hereby certify that on this, the 12th day of July, 2019, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of such filing to the following:

LAURI A. MAZZUCHETTI
PAUL ANDREW ROSENTHAL
KELLEY, DRYE & WARREN, LLP
ONE JEFFERSON ROAD
2ND FLOOR
PARSIPPANY, NJ 07054


_/s/ Sofia Balile_
Sofia Balile